**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| DEMETRICK PENNIE, a Dallas Police Sergeant, and President of the Dallas Fallen Officer Foundation[1] | |
| Plaintiff, | Civil Action No.: _____ |
| v. | **DEMAND FOR JURY TRIAL** |
| DALLAS MORNING NEWS, 1954 Commerce Street Dallas, Texas 75201 | |
| and | |
| NAOMI MARTIN, former writer for Dallas Morning News and current writer for the Boston Globe c/o 1954 Commerce Street Dallas, Texas 75201 | |
| and | |
| ARIANA GIORGI, writer for Dallas Morning News c/o 1954 Commerce Street Dallas, Texas 75201 | |
| and | |
| MAYES MEDIA GROUP, 312 Creekwood Drive Sunnyvale, Texas 75182 | |
| and | |
| BRIAN MAYES, President of Mayes Media c/o 312 Creekwood Drive Sunnyvale, Texas 75182 | |

---

[1] Address withheld for security purposes.

and

DALLAS POLICE ASSOCIATION,
1412 Griffin Street E.
Dallas, Texas 75215

and

MICHAEL MATA,
President of the Dallas Police Association
c/o 1412 Griffin Street E.
Dallas, Texas 75215

and

THOMAS POPKEN,
Member of the Dallas Police Association
443 Easton Road
Dallas, TX 75218

and

DALLAS POLICE ASSOCIATION'S ASSIST
THE OFFICER FOUNDATION, INC.,
1412 Griffin Street E.
Dallas, Texas 75215

and

FREDERICK FRAZIER,
President of Assist the Officer Foundation
c/o 1412 Griffin Street E.
Dallas, Texas 75215

and

JOHN BURK, affiliate of Assist the Officer
Foundation
c/o 1412 Griffin Street E.
Dallas, Texas 75215

and

CITY OF DALLAS,
1500 Marilla Street
Dallas, Texas 75201

and

MIKE RAWLINGS, former Mayor of the City
of Dallas
c/o 1500 Marilla Street
Dallas, Texas 75201

         Defendants.

## COMPLAINT

### I.     INTRODUCTION

Plaintiff Demetrick Pennie brings this action against the Dallas Morning News, Naomi Martin, Ariana Giorgi, Mayes Media Group, Brian Mayes, Dallas Police Association, Michael Mata, Thomas Popken, Assist the Office Foundation, Inc., Frederick Frazier, John Burk, City of Dallas, and Mike Rawlings ("Defendants" unless individually named) in their individual and official capacities and under color of state law, for violations of the Civil Rights Act of 1964, 42 U.S. § 1983, 42 U.S.C. § 1981a, general defamation, defamation per se and defamation by implication. Attached as Exhibit 1 and incorporated by reference is the entirety of the defamatory article. This article taken as a whole is defamatory.

### II.    JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction) because Plaintiff alleges violations of 42 U.S.C. § 1983, a civil action for deprivation of rights, and 42 U.S.C. § 1981a, intentional employment discrimination.

2.     This Court has supplemental jurisdiction over this case pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the civil action for deprivation of rights claims that they form a part of the same case or controversy under Article III of the U.S. Constitution.

3.    This Court has personal jurisdiction over Defendants because each and every one of them is a resident or has a principal place of business in Texas and this district.

4.    Venue is proper over Plaintiff's claims pursuant to 18 U.S.C. § 1965(a) as Defendants reside or have principal places of business in this district and have transacted affairs in this district. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(1), (2), (3) as Defendants reside or have principal places of business in this district, a substantial part of events or omissions giving rise to Plaintiff's claim occurred in this district, and each and every Defendant is subject to the Court's personal jurisdiction with respect to this action in this district.

## III.    PARTIES

### Plaintiff

5.    Plaintiff Demetrick Pennie ("Sergeant Pennie", "Tre", "Penny", or "Plaintiff") is an African American citizen of the United States and resident of the State of Texas. Plaintiff has been employed with the City of Dallas as a Dallas Police Officer for more than twenty years. Plaintiff is recognized as a law enforcement advocate, the President of the Dallas Fallen Officer Foundation ("DFOF"), a writer, and a national media contributor on issues relating to public safety. Plaintiff was raised from humble beginnings but elevated his status based on merit and hard work. He currently holds the rank of police sergeant with the Dallas Police Department. Plaintiff honorably served in the U.S. Army from 1995 to 1999 holding a secret security clearance. Plaintiff is also an academic scholar, holding an Associate's Degree in the administration of justice, a Bachelor's Degree in criminal justice, a Master's Degree in counseling, and a Doctorate of Education in higher education. Plaintiff previously held two university adjunct professorships teaching (1) Terrorism, Criminal Law and Justice and (2) Cultural Diversity and Ethics.

**Defendants**

6.      Defendant Dallas Morning News ("DMN") is a daily newspaper serving the Dallas-Fort Worth area of Texas with an average of 271,000 daily subscribers. Defendant DMN is known for its left-leaning politics and support for liberal candidates such as Hillary Clinton.

7.      Defendant Naomi Martin ("Martin") is an individual natural person and a former Dallas Morning News writer who at all material times co-authored the defamatory article concerning Plaintiff. She is currently a staff writer for the Boston Globe and is a citizen of the state of Texas, upon in formation and belief, in this district.

8.      Defendant Ariana Giorgi ("Giorgi") is an individual natural person and a Dallas Morning News writer who co-authored the defamatory article concerning Plaintiff. She is a citizen of the state of Texas, upon information and belief, in this district.

9.      Defendant Mayes Media Group ("MMG") is a full-service advertising and public relations firm located in Texas, upon information and belief, in this district. Mayes Media is the public relations firm for Defendants Dallas Police Association and Assist the Officer Foundation. Defendant MMG does business in this district.

10.     Defendant Brian Mayes ("Mayes") is an individual, natural person who is a citizen of the state of Texas, upon information and belief, in this district. He is the President of Mayes Media and does business in this district.

11.     Defendant Dallas Police Association ("DPA") is a nonprofit corporation with its principal place of business in Texas. Defendant DPA does business in this district.

12.     Defendant Michael Mata ("Mata") is an individual, natural person who is a citizen of the state of Texas, upon information and belief, in this district. He serves as the President of

Defendant DPA and is an executive with the Assist the Officer Foundation. Defendant Mata does business in this district.

13.    Defendant Thomas Popken ("Popken") is an individual, natural person who is a citizen of the state of Texas, upon information and belief, in this district. He is a representative and member of Defendant DPA and also a founder of Assist the Officer Foundation. Defendant Popken does business in this district.

14.    Defendant DPA's Assist the Officer Foundation, Inc., ("ATO") is a nonprofit corporation with its principal place of business in Texas, upon information and belief, in this district. Defendant DPA does business in this district.

15.    Defendant Frederick Frazier ("Frazier") is an individual, natural person who is a citizen of the state of Texas, upon information and belief, in this district. He serves as the Chairman of Defendant ATO and First Vice President of Defendant DPA. Defendant Frazier does business in this district.

16.    Defendant John Burk ("Burk") is an individual, natural person who is a citizen of the state of Texas, upon information and belief, in this district. Defendant Burk is a YouTube antagonist whose wife is a police officer for Defendant DPA. Defendant Burk does business in this district.

17.    Defendant City of Dallas is the 9th largest city in the United States and is located in the state of Texas. Defendant City of Dallas acted under color of state law.

18.    Defendant Mike Rawlings ("Rawlings") is an individual, natural person who is a citizen of the state of Texas. He is the former Mayor of Dallas. Defendant Rawlings is being sued in his individual capacity, acting under color of state law. Defendant Rawlings does business in this district.

## IV.    STANDING

19.    Plaintiff has standing to bring this action because he has been directly affected, harmed and victimized by the unlawful conduct complained herein. His injuries are proximately related to the conduct of Defendants, each and every one of them, jointly and severally.

## V.    GENERAL ALLEGATIONS

20.    Defendants, each and every one of them acting in concert, conspired, instituted, ordered, commanded and/or ratified the conduct alleged herein from the state of Texas.

21.    Defendants, each and every one of them acting in concert, conspired, directed and coordinated an attack based on race and discrimination to deprive Plaintiff of his rights to exist as an African American leader of a credible nonprofit in Dallas.

22.    The discriminatory acts are continuing and the likelihood for the discriminatory acts to continue is great.

23.    Plaintiff, the President of Plaintiff DFOF, was the target of racial discrimination and a coordinated conspiracy to topple his organization and to publicly defame his character, as organized by Defendants DPA and ATO and their representatives, in conjunction with Defendants City of Dallas, Rawlings, DMN and its representatives and Mayes Media and its representatives. Plaintiff asserts that his race was highlighted as the basis for a coordinated conspiracy – being an African American conservative who rose from humble beginnings to now being nationally-recognized as a law enforcement advocate and the founder of a respected nonprofit group in Texas. Plaintiff threatened the status quo and the organized monopoly that has been in place for years with Defendants.

24.    Plaintiff DFOF was formed in 2009 by active members of the Dallas Fraternal Order of Police, a then Dallas-based police association. Plaintiff DFOF never became fully

functional until 2014, when Plaintiff Pennie and his leadership reorganized it. The organization held a loose affiliation with the Dallas Fraternal Order of Police Lodge #588 but maintained its independence from all other groups and associations in Dallas, Texas.

25.    Plaintiff DFOF is a nonprofit police-support organization designed to assist the families of police officers killed or critically injured in the line of duty. The organization holds community engagements as one of its primary goals and uses education and advocacy to address issues impacting law enforcement and public safety. The organization also specializes in sponsoring events for police survivors.

26.     Since Plaintiff DFOF is a fairly recent organization, it employs multiple measures to fundraise, including but not limited to: relying on direct donors, mail solicitations, recycling bins, fundraising events and contracted telemarketing services. In accordance with Chapter 44 of the Texas Business & Commerce Code for phone solicitations, Plaintiff DFOF lawfully employs third-party professional telemarketers for fundraising purposes.

27.    After the July 7, 2016 shooting attack in downtown Dallas that killed five police officers, Plaintiff DFOF, led by Plaintiff Pennie, mobilized to assist the families of the fallen and injured officers; a campaign referred to as #PrayForDallas. Plaintiff DFOF was independently working on its #PrayForDallas initiative and also maintained its normal operations as outlined by the telemarketing contracts to raise awareness about Plaintiff DFOF and to raise money to support of the organization's mission.

28.    Plaintiff DFOF was one of the three charitable organizations affiliated with the Dallas Police Department and Defendant City of Dallas collecting donations for the injured officers and fallen officers' families. The other organizations were Defendant ATO and the Dallas Foundation.

29.     Following the 2016 tragedy, Plaintiff DFOF, in conjunction with its fundraiser companies, raised monies totaling $1.3 million for philanthropic purposes of which more than $580,000 was donated to families of fallen and injured officers.

30.     Defendant DPA is the oldest and largest police union in Defendant City of Dallas, having nearly 3,000 members. Defendant DPA was formed in 1959 and currently holds the greatest political and media influence in Defendant City of Dallas of all police unions. Defendant Mata heads it.

31.     Defendant DPA has a directly-affiliated organization called ATO, which is led by Defendant Frazier. Defendant ATO provides financial assistance to officers who are facing the loss of income due to a serious injury, life-threatening illness or other catastrophic event. Immediate assistance is also available to an officer's family in the event of the death of an active officer.

32.     Defendant DPA wanted to maintain its status as the largest police association in Dallas so it sought to collapse the Dallas Fraternal Order of Police and anyone associated with it. In doing so, Defendant DPA, in conjunction with the other Defendants, intentionally targeted Plaintiff. Consequently, because of Defendant DPA's and ATO's efforts, in 2018, the Dallas Fraternal Order of Police Lodge #588 folded; which resulted in Defendant DPA establishing its own Fraternal Order of Police charter as Lodge #716.

33.     Defendant DPA believed that it and Defendant ATO should be the only groups in Dallas fundraising for fallen officers, so it constantly attacked Plaintiff by spreading false, defamatory and misleading statements and rumors to maliciously tarnish the reputation of Plaintiff. Defendants DPA, ATO, Mata, Frazier, Popken, Rawlings and Burk worked with others to publish false and defamatory statements of fact about Plaintiff and his DFOF.

34.     These false, defamatory and misleading statements include but are not limited to:

I've heard that the fop Fallen officer foundation is using a call center to do this . . . . Your question should be who's running this? what's been his or hers involvement throughout their career helping officers and their families? Sorry this pisses me off because I know this is scam to raise monies these families will never see. (Defendant Frazier).

I don't know why people/Officers can't see it. The DPA has been attacked over and over again by other groups. Because the DPA has always done it right over the years and held the position of power. Penny [Plaintiff] is trying to protect his phony BS. When ATO was started there was nothing. The DPA started ATO and made sure it helped ALL officers member or not. The other groups tried to copy and created BS! Signal 15, from LPOA! Scam! I think Penny [Plaintiff] is more of a criminal than a cop but that is just my opinion! (Defendant Popken).

No legit organization would phone solicit! (Defendant Popken).

This is a very concerning report about potential mismanagement of funds intended to support the families of our fallen police officers . . . (citing defamatory article) (Defendant Rawlings).

To "officer" Tre Pennie (pennienotsowise) [Plaintiff] this is for you. Your lawsuit towards the ATO foundation, and all others you've went after is pretty despicable of you. Submitted from a friend: 5%. That number should tick you off. I checked out another charity Dallas Sgt. Demetrick Pennie is director of: TEXAS Fallen Officer Foundation. For those catching up, I asked Pennie [Plaintiff] "What % of funds are donated to officer families." His response "shut up" forced me to find info myself. Of the $1 million dollars raised for officers . . . ONLY 5% is given to families of the fallen. FIVE PERCENT! That's only $52,000 out of $1 MILLION given to mission of the charity . . . This is my city and I'll guard her against sell out companies such as yourself. I'll do it myself and do it the right way. One man vs. a million dollar company. Pathetic. (Defendant Burk).

35.     These types of defamatory postings on social media prompted one reader to attack Plaintiff and say, "[y]ou're a crooked thief. YOU are the reason people hate cops. I'm glad John Burk exposed your bitch ass. Please kill yourself you greedy self serving fu*k."

36.     Defendant Frazier heads Defendant ATO. Following the July 7, 2016 attack, Defendants DPA and ATO organized to raise money for the families of the fallen that were killed in the attack.

37.     The July 7, 2016 shooting attack in Dallas was the greatest loss of law enforcement life since the September 11, 2001 terrorist attack in New York City. In the immediate aftermath of the attack, Defendants DPA, ATO, Frazier, and Mata saw an opportunity to increase their statewide and national influence and held out Defendant ATO as the preferred charity in Defendant City of Dallas. Defendant City of Dallas, represented by Defendant Rawlings as Mayor, publicly endorsed Defendant ATO and encouraged citizens to support it in an effort to help Defendant ATO monopolize fundraising.

38.     After the July 7, 2016 attack, Defendant Frazier negotiated an illegal agreement with Defendant City of Dallas called the "Donations Management Agreement." It is called Administrative Action No. 16680, which lists its effective date as October 21, 2016.

39.     Defendants ATO's and City of Dallas's illegal Donations Management Agreement permitted Defendant City of Dallas to intercept and deliver mail to Defendant ATO for the purpose of it opening, reading and depositing any donations it found within the mail into its bank account, regardless of who the donations were for.

40.     Donations poured in from across the country with a vast majority of the donations going to Defendant ATO. Allegedly, Defendants DPA and ATO raised more than $12 million but the monies were retained in a trust account. This action would later lead one of the families to file suit against Defendants DPA and ATO. (*See Katrina Ahrens v. Dallas Police Association, et al.*, 2017 No. DC-C201700365).

41.     Defendant City of Dallas received several donations, checks and letters that were addressed to DFOF and intentionally rerouted them to Defendant ATO.

42.     It was later learned that Defendant ATO illegally stole and cashed more than $12,000 of monies belonging to Plaintiff's DFOF.

43.     After learning of the theft and illegal contract with Defendant City of Dallas, Plaintiff's DFOF filed a federal lawsuit alleging, among other causes of action Racketeer Influenced and Corrupt Organizations Act ("RICO") violations, in the U.S. District Court for the Northern District of Texas. (*See Dallas Fallen Officer Foundation v. Frederick Frazier, et al.*, 4:18-cv-00481). The Judge denied Defendants' motions to dismiss and the case is still pending.

44.     Defendant DMN requested that Plaintiff and DFOF's attorney come to its studio for an interview. Initially, Plaintiff had reservations about the interview because Defendant DMN had previously attacked him for filing a 2016 federal lawsuit against Black Lives Matter, a divisive organization with a radicalized message inciting violence against police. But, Plaintiff believed that Defendant DMN had an obligation to report the facts accurately without influencing public opinion.

45.     Prior to the interview, Defendant DMN writer Defendant Martin advised Plaintiff that she wanted to write a positive news story about Plaintiff's work in the community for the fallen officers. Defendant Martin asked Plaintiff to stage a photograph in front of the Dallas Police Memorial. Plaintiff agreed.

46.     During the interview, based on Defendant Martin's antagonistic line of questioning about Plaintiff's background, political beliefs, associations and fundraising strategies for DFOF, Plaintiff knew that something was wrong as the line of questioning reflected the false and defamatory statements posted on social media by Defendant DPA and others about Plaintiff. It became clear to Plaintiff that Defendants DMN, Martin and Giorgi intended to write a "hit piece" despite the evidence he provided them, contradicting their false and defamatory statements.

47.     On March 29, 2018, Defendant DPA's President, Defendant Mata, falsely circulated an email to all Defendant DPA members and posted on social media making false allegations of "co-mingling" suggesting that DFOF was co-mingling funds with the Dallas Fraternal Order of Police, Lodge #588. Shortly after, Defendant ATO assignee, Defendant Burk, posted a pre-amended copy of DFOF's 2016 990 on line with a category listed as "management fees" circled, showing $100,000 and falsely claimed that it was Plaintiff's salary. Defendant Martin inquired about this in a skeptical way.

48.     Defendant Martin then pulled out an old printed article attached to a "blog posting" that previously had been removed from the Internet and she asked Plaintiff about being shot in the leg in 2003 while visiting his grandmother in Houston, Texas. Plaintiff told Defendant Martin that being shot had nothing to do with DFOF or Plaintiff's management philosophy, but advised her that he would gladly discuss the incident, as it was part of his platform.

49.     Plaintiff explained that he travels the country giving motivational speeches about the incident to police groups, conservative clubs and youth organizations – explaining that "critical experiences in life ultimately shape our perspectives." Plaintiff further explained that although the shooting was accidental and involved no wrongdoing, his "near-death" experience caused him to place greater focus on God and to his police career.

50.     Over the following weeks, Defendant Martin asked additional questions about Plaintiff, his family, his organization DFOF and other affiliations. Plaintiff remained open and honest and provided Defendant Martin with context including: relevant documents; a legal opinion from Errol Copilevitz – DFOF's second attorney and a recognized legal authority on telemarketing; a response from an accountant; and a response from the actual fundraiser

company. The company asked Defendant Martin to publish his response in its entirety of which she agreed, but intentionally failed to do when the final publication came out.

51.     Plaintiff and his affiliates simply requested Defendants DMN, Martin and Giorgi to report the material accurately, so that the public could truly understand the process, Plaintiff's efforts concerning DFOF and the reasons why the lawsuit was filed against Defendant DPA and ATO for RICO violations and theft.

52.     Prior to publishing the story, Plaintiff invited Defendant Martin to one of DFOF's events in which the organization hosted about twenty fallen officer families for a private movie screening. Plaintiff invited Defendant Martin so that she could see first-hand what the organization does, how it operates differently from all other groups and to demonstrate that the organization's work cannot be compared dollar-for-dollar in donations with any other group because no other group specializes in family events like "family movie night' like DFOF.

53.     Defendant Martin declined Plaintiff's offer.

54.     During a phone interview, Defendant Martin made it obvious that she was intentionally writing a negative, false, misleading and defamatory story about Plaintiff. Defendant Martin indicated that she received information from Defendant Mayes of Defendant Mayes Media, who represents Defendants DPA and ATO about Plaintiff's operation. Plaintiff warned Defendant Martin that Defendant Mayes Media had an alternative agenda to discredit and defame him and asked the writer to be cautious of any information received by Defendants DPA, ATO or their partnering sources or affiliates. Plaintiff specifically told Defendant Martin to report accurately.

14

55.     When Defendants DMN, Martin and Giorgi finally published their false, misleading and defamatory article, it was riddled with "dog whistles"[2], racial undertones and racist tropes including a headline that reads "From Food stamps to Fox News" (this title was changed in the actual hardcopy publication, suggesting that Defendants DMN, Martin and Giorgi realized the racial insensitivity of the header), half-truths and blatant false and misleading misrepresentations and statements to discredit Plaintiff personally and attack his reputation and the credibility of his DFOF.

56.     The false, misleading and defamatory article was published by Defendants DMN, Martin and Giorgi on August 17, 2018 and titled, "DPD Sergeant Collected Millions for Fallen Officers. A Fraction Went to the Families."

57.     Defendants DMN, Martin and Giorgi drew specific attention to Plaintiff's facial features as to try to paint a picture of a "cunning" black man who takes advantage of people. Defendants DMN, Martin and Giorgi intentionally used people in the article that they knew had prior conflicts with Plaintiff and Defendants DMN, Martin and Giorgi trumped up false allegations and misrepresentations to sway public opinion about Plaintiff.

58.     Defendants DMN, Martin and Giorgi falsely and maliciously published that Plaintiff and the telemarketing company had a special relationship that included "kickbacks" and other deals.

59.     Defendants DMN, Martin and Giorgi acted with actual malice when they published this because Plaintiff provided them proof to the contrary. They knew what they

---

[2] A dog whistle is a type of strategy of communication that sends a message that the general population will take a certain meaning from but a certain group that is "in the know" will take away the secret, intended message.

published was false or at least acted with a reckless disregard to the truth. Defendants DMN, Martin and Giorgi intentionally and maliciously caused harm to Plaintiff.

60.     Defendants DMN, Martin and Giorgi wrote the article as if both the DFOF and the Texas Fallen Officers Foundation ("TFOF") were involved in fundraising for the July 7, 2016 tragedy. This is not the case as the Texas Fallen Officers Foundation was not formed during the time. Defendants DMN, Martin and Giorgi falsely imply that Plaintiff's involvement with both organizations was a scam orchestrated by him.

61.     Defendants DMN, Martin and Giorgi knew the truth at the time they published the false, misleading and defamatory article. They knew that DFOF and the TFOF were two separate groups run by Plaintiff. Different boards controlled the groups, they shared no finances, nor board members or any resources at the time. Defendants DMN, Martin and Giorgi intentionally mixed DFOF's and TFOF's finances together to paint a skewed image of Plaintiff and his organizations to destroy him and the organizations simultaneously. *See* https://www.dallasnews.com/opinion/editorials/2018/08/23/charities-slain-injured-officers-cannot-betray-public-trust.

62.     Because of Defendants DMN's, Martin's and Giorgi's defamatory misconduct, the false and misleading article led to severely damaging social media attacks against Plaintiff and the DFOF. As a direct result of Defendants DMN's, Martin's and Giorgi's defamatory misconduct, Plaintiff was damaged by causing loyal corporate donors and other donors to distance themselves from Plaintiff. Defendants DMN, Martin and Giorgi hurt Plaintiff's and DFOF's ability to fundraise and form new business relationships because of the false and misleading statements published in the article.

63.     The other defamatory statements in the article are numerous:

Most of that money never made it to fallen officers' families, a *Dallas Morning News* investigation has found. Instead the bulk of it went to three telemarketing companies, one of which is owned by Pennie's friend. Tens of thousands of dollars went straight into Pennie's pocket.

Officers' families received only 22 percent of the total $3.2 million donated to Pennie's two charities in 2016 and 2017, according to the groups' most recent IRS filings.

Pennie's expenditures run counter to best practices established by the Better Business Bureau that recommend charities spend no more than $35 of every $100 from donors on fundraising costs such as telemarketers.

Last year, for every $100 donated to Pennie's Texas Fallen Officer Foundation, just $5 went to families, while $74 went to telemarketers, $15 to cash reserves and $6 to travel, meals and expenses for Pennie and his team.

For every $100 donated last year, $10 went to fallen officers' families, while $48 went to telemarketers, $25 to cash reserves and $17 to travel, salaries and other expenses.

The bureau says at least 65 percent of a nonprofit's spending should go toward fulfilling its core mission. Last year, the Texas Fallen Officer Foundation and the Dallas Fallen Officer Foundation allocated just 6 percent and 13 percent of their spending, respectively, toward helping families.

That's far out of line with other big-city police charities that share the same mission, a *News* analysis of IRS filings shows.

Meanwhile, the charity work is benefiting Pennie.

Last year, Pennie was paid $43,300 from funds donated to the Dallas Fallen Officer Foundation, IRS records show. That's in addition to his $89,400 police salary . . .

Bringing Fredde's company in saw serious money flow into the Dallas Fallen Officer Foundation for the first time in years. In 2015, donors gave the foundation $75,632. But the increased money coming in from donors wasn't a windfall for the families of fallen officers. About 72 percent of donations went to telemarketing expenses, records show. After internal expenses, just $9,135 was distributed to families.

In 2016, the year of the July 7 shootings, the Dallas Fallen Officer Foundation received far more donations than it ever had. By year's end, donors had given nearly $1.4 million. Pennie distributed $570,800 to 86 recipients. IRS records were unclear on exactly who the recipients were. But Pennie said he delivered

$50,000 to each of the five families who lost an officer on July 7 and $25,000 to each wounded officer's family.

The following year, the Dallas Fallen Officer Foundation would bring in another substantial haul, $800,000. Of that, just $82,000 was distributed as charity. It went to 35 recipients, records show.

Pennie had previously garnered headlines for his response to then-Cleveland Browns running back Isaiah Crowell, who posted on Instagram a drawing of a hooded man slitting a police officer's throat. Crowell accepted Pennie's invitation to Dallas to meet officers. That fall, he donated his first game paycheck - worth about $35,000 - to one of Pennie's foundations.

The telemarketing worked. Statewide Appeal and two other telemarketing companies -- With Community Services and Southwest Public Relations -- brought in a total of $970,732 and $484,555 last year to Texas Fallen Officer and Dallas Fallen Officer, respectively, IRS records show. The foundations kept about 20 percent of the money from donors, and a smaller percentage still actually went to cops' families, records show. The telemarketers With Community Services and Southwest Public Relations didn't return calls seeking comment.

In 2016 and 2017, Pennie's foundations paid 41 percent of all donations to telemarketing companies -- double the amount donated to officers' families.

"I do not think Fallen Officer donates a significant % of funds raised," wrote Colleen Smith, a Dallas officer's wife. "So here is a chance to set things straight... How much did Fallen Officer Foundation donate to families after July 7?"

"Shut up!" Pennie replied. A minute later, he added: "Ask my families."

Pennie continues to raise funds. In May, he started a third charity, the National Fallen Officer Foundation.

64.     All of the above statements in paragraph 63 of this Complaint are false and/or misleading.

65.     The false and misleading statements about Plaintiff's mismanagement of funds are discriminatory and offensive because they painted a false picture and implication that black people from inner cities have "no business" managing that type of money. This message coincided with Defendant Rawlings's statements earlier the same week after a black city official

was indicted on federal bribery charges. Defendant Rawlings stated to the press, "[t]oo often public servants that come from poor parts of our city are caught in and let themselves be caught in a trap around money, around economic inclusion, because they don't have any money. See http://www.klif.com/2018/08/10/dallas-mayor-says-caraway-scandal-is-an-example-of-lack-of-economic-inclusion-in-dallas/.

66.     Immediately after Defendants DMN, Martin and Giorgi published the defamatory article, Defendant Rawlings posted a snapshot of the image on his Facebook page with Plaintiff tagged to the post with a demeaning comment suggesting that Plaintiff mismanaged funds. In the same post, Defendant Rawlings praised Defendant Frazier and Defendant ATO for their work despite the fact that they were currently being sued by one of the fallen officer's families for that very issue – mismanagement of funds.

67.     Defendants Rawlings and City of Dallas made it clear that they were in the business of "picking winners and losers" among charities in Dallas. And it was obvious that the DFOF was intended to be a "loser" in their plotted conspiracy to intentionally and maliciously take down Plaintiff. Defendants Rawlings and City of Dallas sought to destroy Plaintiff's reputation which in turn would destroy his organization, DFOF.

68.     Defendants DMN, Martin and Giorgi conspired with others to carry out the malicious and defamatory attack on Plaintiff. These Defendants intentionally avoided key facts to negatively sway the audience's opinion and to cast a false and negative, defamatory light on Plaintiff. Defendants DMN, Martin and Giorgi engaged in journalistic malpractice by convoluting a story and intentionally and maliciously misquoting people favorable to Plaintiff. The defamatory article was not only false but it was racially motivated to promote its narrative that a black man should not be in charge of significant amounts of money.

69.     Defendants Martin and Mata are "friends" on social media and were "friends" prior to writing the defamatory article.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
*Violations of 42 U.S.C. § 1981a*
*Damages in Cases of Intentional Discrimination in Employment*
*Against Defendants Rawlings and City of Dallas*

70.     Plaintiff repeats and re-alleges all of the previous allegations of the entirety of this Complaint, with the same force and effect, as if fully set forth herein again at length.

71.     Defendants Rawlings' and City of Dallas' discrimination against Plaintiff is in violation of the rights of Plaintiff afforded by 42 U.S.C. § 1981.

72.     By the misconduct described herein, Defendants Rawlings and City of Dallas intentionally deprived Plaintiff, an African American male, the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of his employment relationship in violation of 42 U.S.C. § 1981.

73.     As a result of Defendant Rawlings' and City of Dallas' discrimination, Plaintiff has been denied employment opportunities providing substantial compensation and benefits, thereby entitling him to injunctive and equitable monetary relief; and has suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of Defendants' actions, thereby entitle him to compensatory damages.

74.     In their discriminatory actions as alleged, Defendants Rawlings and City of Dallas acted with actual or a reckless indifference to the rights of the African American Plaintiff, thereby entitling him to an award of punitive damages.

### SECOND CAUSE OF ACTION
*Violations of 42 U.S.C. § 1983*
*Retaliation in Violation of the First Amendment (Free Speech)*

*Against Defendants Rawlings and City of Dallas*

75.     Plaintiff repeats and re-alleges all of the previous allegations of the entirety of this Complaint, with the same force and effect, as if fully set forth herein again at length.

76.     42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

77.     Plaintiff in this action is a citizen of the United States.

78.     Defendants Rawlings and City of Dallas were acting under color of state law in their capacity as the Mayor of Dallas and the City of Dallas and their acts and/or omissions were conducted within the scope of their official duties or employment.

79.     At the time of the complained of events, Plaintiff had the clearly established constitutional right to be free from retaliation for the exercise of protected speech.

80.     Any reasonable person knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

81.     Plaintiff exercised his constitutionally protected right to espouse politically conservative views and discuss such views on public forums, such as the media.

82.     Retaliatory animus for Plaintiff's exercise of his constitutionally protected right of free speech was a substantially motivating factor in Defendants Rawlings' and City of Dallas' intentional sabotaging of Plaintiff's DFOF by publishing false and defamatory statements concerning Plaintiff and DFOF.

83. The retaliatory animus by Defendant Rawlings and City of Dallas would deter a person of ordinary firmness from continuing to engage in the protected conduct of freedom of speech.

84. Defendant Rawlings and City of Dallas engaged in the conduct described by this Complaint willfully, maliciously, in bad faith and in reckless disregard of Plaintiff's protected constitutional rights.

85. The acts or omissions of Defendants Rawlings and City of Dallas were moving forces behind Plaintiff's injuries.

86. Defendants acted in concert, jointly and severally.

87. The acts or omissions of Defendants Rawlings and City of Dallas intentionally deprived Plaintiff of his constitutional and statutory rights and caused him damages.

88. Defendant Rawlings and City of Dallas are not entitled to qualified immunity for the complained of conduct.

89. Defendant Rawlings and City of Dallas were acting pursuant to municipal/county custom, policy, decision, ordinance, regulation, widespread habit, usage or practice in their actions pertaining to Plaintiff.

90. As a proximate result of Defendants Rawlings' and City of Dallas' unlawful conduct, Plaintiff has suffered damages and losses entitled him to compensatory and special damages, in amounts to be determined at trial.

91. In addition to compensatory, economic and other damages, Plaintiff is entitled to punitive damages against Defendants Rawlings and City of Dallas under 42 U.S.C. § 1983, in that the actions of each Defendant has been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional and statutory rights of Plaintiff.

## THIRD CAUSE OF ACTION
### *Violations of 42 U.S.C. § 1983*
### *Racial Discrimination in Violation of the Equal Protection Clause of the Fourteenth Amendment*
### *Against Defendants Rawlings and City of Dallas*

92.     Plaintiff repeats and re-alleges all of the previous allegations of the entirety of this Complaint, with the same force and effect, as if fully set forth herein again at length.

93.     42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

94.     Plaintiff in this action is a citizen of the United States.

95.     Defendants Rawlings and City of Dallas were acting under color of state law in their capacity as the Mayor of Dallas and the City of Dallas and their acts and/or omissions were conducted within the scope of their official duties or employment.

96.     At the time of the complained of events, Plaintiff had the clearly established constitutional right to be free from racial discrimination by Defendants Rawlings and the City of Dallas and to enjoy the equal protection of the laws.

97.     42 U.S.C. § 1981 provides, in pertinent part:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

98.     Plaintiff, as an African American is a member of a protected class, and thus also had the clearly established right under this provision of 42 U.S.C. § 1981 to be free from racially motivated discrimination for his works through his foundation DFOF.

99.     Any reasonable person knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

100.    Plaintiff's race was a motivating factor in the decisions to libel, defame and slander him and maliciously accuse him of false statements of fact. Defendants Rawlings' and City of Dallas' conduct was undertaken with the purpose of depriving Plaintiff of the equal protection and benefit of the law, equal privileges and immunities under the law, and due process in violation of the Fourteenth Amendment.

101.    Defendant Rawlings and City of Dallas engaged in this conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Plaintiff's protected rights.

102.    The acts or omissions of Defendants Rawlings and City of Dallas were moving forces behind Plaintiff's injuries.

103.    The Defendants acted in concert, jointly and severally.

104.    The acts or omissions of Defendants Rawlings and City of Dallas intentionally deprived Plaintiff of his constitutional and statutory rights and caused him damages.

105.    Defendant Rawlings and City of Dallas are not entitled to qualified immunity for the complained of conduct.

106.    Defendant Rawlings and City of Dallas were acting pursuant to municipal/county custom, policy, decision, ordinance, regulation, widespread habit, usage or practice in their actions pertaining to Plaintiff.

107.     As a proximate result of Defendants Rawlings' and City of Dallas' unlawful conduct, Plaintiff has suffered damages and losses entitled him to compensatory and special damages, in amounts to be determined at trial.

108.     In addition to compensatory, economic and other damages, Plaintiff is entitled to punitive damages against Defendants Rawlings and City of Dallas under 42 U.S.C. § 1983, in that the actions of each Defendant has been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional and statutory rights of Plaintiff.

## FOURTH CAUSE OF ACTION
### *Violations of the Civil Rights Act of 1964*
### *Against Defendants Rawlings and City of Dallas*

109.     Plaintiff repeats and re-alleges all of the previous allegations of the entirety of this Complaint, with the same force and effect, as if fully set forth herein again at length.

110.     By Defendant Rawlings' and City of Dallas' plot to take down Plaintiff and his DFOF because of his color, Plaintiff was treated less favorably then other nonprofit groups with a similar purpose to DFOF in violation of 42 U.S.C. § 2000d.

111.     Defendants Rawlings and City of Dallas intentionally, willfully and without justification acted to deprive Plaintiff of his rights, privileges and immunities secured to him by the laws of the United States, including his right to be free from racial discrimination in programs or activities relating to raising money for fallen officers and their families.

112.     Defendants Rawlings and City of Dallas, despite knowledge and adequate opportunity to learn of their misconduct, adopted, approved, and ratified their own misconduct.

113.     The acts were intentional, malicious, willful, wanton and in gross and reckless disregard of Plaintiff's rights secured by the laws of the United States.

## FIFTH CAUSE OF ACTION
### *General Defamation*

*Against Defendants DMN, Martin, Giorgi, Mayes Media Group, Mayes, DPA, Mata, Popken,*
*ATO, Frazier, Rawlings and Burk*

114.    Plaintiff repeats and re-alleges all of the previous allegations of the entirety of this Complaint, with the same force and effect, as if fully set forth herein again at length.

115.    Defendants, each and every one of them acting in concert, jointly and severally, and individually, have defamed Plaintiff by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements about Plaintiff which they knew or should have known to be false and misleading.

116.    Defendants' defamatory publications are not privileged in any way or manner.

117.    To establish general defamation, a plaintiff need only show that a person or entity (1) published a false statement; (2) about another person; (3) to a third party; and (4) the falsity of the statement caused injury to the other person.

118.    The false, defamatory and misleading publications about Plaintiff were published by Defendants and the falsity of the statements caused injury to Plaintiff.

119.    Defendants knew or had reason to know that their publications were false and misleading.

120.    The false impression of Plaintiff, which Defendants created, caused irreparable harm to Plaintiff, his reputation, his business and person and his calling.

### SIXTH CAUSE OF ACTION
*Defamation by Implication*
*Against Defendants DMN, Martin, Giorgi, Mayes Media Group, Mayes, DPA, Mata, Popken,*
*ATO, Frazier, Rawlings and Burk*

121.    Plaintiff repeats and re-alleges all of the previous allegations of the entirety of this Complaint, with the same force and effect, as if fully set forth herein again at length.

122.     Defendants, each and every one of them acting in concert, jointly and severally, and individually, have defamed Plaintiff by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements about Plaintiff which they knew or should have known to be false and misleading.

123.     Defendants' defamatory publications are not privileged in any way or manner.

124.     Defamation by implication is an intentional tort recognized in Texas. "[A] plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000).

125.     Defendants, each and every one of them acting in concert, jointly and severally, and individually, published false statements about Plaintiff and these statements were defamatory in that they created a false impression of Plaintiff.

126.     Defendants juxtaposed a series of facts so as to imply a defamatory connection between them or, in the alternative, created a defamatory implication by omitting facts when describing the nature and sequence of events.

127.     A reasonable person would understand Defendants' statements to impart the false innuendo, which would be highly offensive to a reasonable person.

128.     Defendants, each and every one of them acting in concert, jointly and severally, and individually, intended or endorsed the defamatory inferences that the published statements created and these false, defamatory and misleading statements were made with actual malice.

129.     The false impression of Plaintiff, which Defendants created, caused irreparable harm to Plaintiff, his reputation, his business and person and his calling.

## SEVENTH CAUSE OF ACTION
### *Defamation Per Se*
### *Against Defendants DMN, Martin, Giorgi, Mayes Media Group, Mayes, DPA, Mata, Popken, ATO, Frazier Rawlings and Burk*

130.    Plaintiff repeats and re-alleges all of the previous allegations of the entirety of this Complaint, with the same force and effect, as if fully set forth herein again at length.

131.    Defendants, each and every one of them acting in concert, jointly and severally, and individually, have defamed Plaintiff by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements about Plaintiff which they knew or should have known to be false and misleading.

132.    Defendants' defamatory publications are not privileged in any way or manner.

133.    A statement is defamatory per se in Texas if, among other things, it imputes injury to a plaintiff's office, business, profession, or calling; imputes a plaintiff committed a crime; imputes that a plaintiff possesses a loathsome disease; or imputes that the plaintiff has engaged in sexual misconduct. *Downing v. Burns*, 348 S.W.3d 415, 424 (Tex. App. 2011).

134.    Texas defines defamation per se as words that "are so obviously harmful to the person aggrieved, that no proof of their injurious effect is necessary to make them actionable." *Alainz v. Hoyt*, 105 S.W.3d 330, 345 (Tex. App. 2003).

135.    The false, defamatory and misleading nature of Defendants' publications subjected Plaintiff to ridicule, hatred, disgust and contempt.

136.    The false, defamatory and misleading publications were made with actual malice because Defendants knew or had reason to know that their publications were false and misleading.

137.    These false impressions of Plaintiff, which Defendants created, caused irreparable harm to Plaintiff, his reputation, his business and person and his calling.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Demetrick Pennie prays for judgment against Defendants, each and every one of them, jointly and severally, as follows: general damages, special damages, punitive damages, pre-judgment and post-judgment interest as allowed by law, costs of suit incurred herein in an aggregate amount in excess of $290,000,000.00 and any other relief the Court deems just and proper, for the illegal, unconstitutional and intentional and malicious acts of the Defendants, each and every one of them, against Plaintiff.

## VIII.   DEMAND FOR JURY TRIAL

**Plaintiff demands a trial by jury on all counts and issues so triable.**

**Dated**: August 14, 2019                                   Respectfully submitted,

*/s/ Larry Klayman*
Larry Klayman, Esq.
KLAYMAN LAW GROUP, P.A.
D.C. Bar No. 334581
2020 Pennsylvania Ave. NW, Suite 800
Washington, D.C. 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

*Attorney for Plaintiff*